# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# ROCK HILL DIVISION

| | |
|---|---|
| Pearl Insurance Group, LLC, | ) |
|                 Plaintiff, | ) Civil Action No.: 0:18-cv-02353-JMC |
| v. | ) **ORDER AND OPINION** |
| David J. Baker and IGO Insurance Agency, Inc., | ) |
|                 Defendants. | ) |

This matter is before the court on Plaintiff Pearl Insurance Group, LLC's ("Plaintiff") Motion for Temporary Restraining Order, for Preliminary Injunction, for Civil Seizure of Devices, and for Expedited Discovery. (ECF No. 6.) An emergency hearing was held regarding Plaintiff's Motion on August 27, 2018. (ECF No. 7.) After careful consideration of Plaintiff's Motion, along with the declarations and exhibits attached thereto, the court **GRANTS** the Motion for Temporary Restraining Order and **HOLDS IN ABEYANCE** the remaining requests.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is an action to protect confidential trade-secret information and to enforce non-solicitation and non-disclosure provisions in an Employment Agreement ("the Agreement") between Plaintiff and Defendants David J. Baker and IGO Insurance Agency, Inc. (ECF No. 1.) Plaintiff is a privately held insurance company that provides national insurance coverages to businesses, individuals, associations, and unions. (ECF No. 6-1 at 2.) Defendant Baker was employed by Plaintiff as a Regional Director from on or about August 22, 2011, until March 30, 2018. (ECF No. 6-1 at 2, 4.) On July 26, 2011, in connection with the start of his employment with Plaintiff, Defendant Baker signed the Agreement. (ECF No. 1-1 at 4; ECF No. 6-3 at 2.) The

1

Agreement contains restrictive covenants that applied during Defendant Baker's employment with Plaintiff and for two years following his separation of employment from Plaintiff. (ECF No. 1-1 at 2-3.) Section 3 of the Agreement provides, in relevant part, as follows:

> [T]he Employee has agreed to devote his/her full time, energy, and efforts to [Plaintiff]'s business, except with [Plaintiff]'s written approval, and to refrain, during the term of his/her employment and for a period of two years after the termination of that employment, either directly or indirectly, from:
>
> . . .
>
> (b) contacting any client of [Plaintiff] for the purpose of soliciting, for anyone other than [Plaintiff], the type of business in which [Plaintiff] is engaged; and for which the Employee was employed;
>
> (c) accepting, for anyone other than [Plaintiff], the type of business for which the Employee was employed and in which [Plaintiff] is engaged from any [Plaintiff] client which the Employee has solicited or to whom [Plaintiff] has provided insurance during the term of this Agreement; and
>
> (d) disclosing, except as directed by [Plaintiff], any confidential data, process or procedure utilized by [Plaintiff] in developing and maintaining its business, including (but not limited to) the names and addresses of any client, agent or broker; the needs of any client with respect to the type of business in which [Plaintiff] is engaged, marketing goals and practices; and product, policy or service costs and analyses.

(ECF No. 1-1 at 2-3.)

As set forth in Plaintiff's Declarations, on the morning of March 27, 2018, Defendant Baker phoned his supervisor and told him that he was giving two-weeks' notice of his resignation of employment, to be effective on April 10, 2018. (ECF No. 6-3 at 4.) Defendant Baker told his supervisor that he was planning on taking at least a couple of months off to figure out what he wanted to do next, but that he did not have any other plans for immediate employment. (ECF No. 6-4 at 2.) Defendant Baker followed up his telephone notice with an email, repeating the statement,

"I am not going back to work right away. I am taking some personal time off." (ECF No. 6-4 at 3, 10.)

Three days later, on Friday, March 30, 2018, Defendant Baker emailed one of Plaintiff's customers, making negative statements about the company and informing the customer that he would be moving to Defendant IGO Insurance Agency, Inc. in less than two weeks, that his cell phone number would not be changing, and that he would "continue to take care of you and your business." (*Id.* at 13.) The customer copied his response to Defendant Baker's email and to Plaintiff's underwriter, who had previously been working with the customer and Defendant Baker on the renewal of the customer's automobile coverage with Plaintiff. (*Id.* at 3.) Baker was immediately terminated on March 30, 2018, after his supervisor and Plaintiff's upper management found out about the email. (ECF No. 6-3 at 4; ECF No. 6-4 at 4.) Defendant Baker's access to Plaintiff's email and communication systems was immediately discontinued, and the company's human resources executive demanded that Defendant Baker immediately return all company property. (ECF No. 6-3 at 26; ECF No. 6-4 at 4.)

Shortly after Defendant Baker's termination, Plaintiff began to receive information that Defendant Baker was soliciting his former customers to move their insurance business to Defendant IGO. (ECF No. 6-4 at 4.) Defendant Baker's former supervisor submitted a declaration in which he recounted the emails and other evidence he collected regarding suspicious contacts from Defendant Baker's former clients. (*Id.*)

On April 25, 2018, Plaintiff's human resources executive sent a certified letter to Defendant Baker at his home address reminding him of his obligations under the Agreement with Plaintiff, specifically the non-disclosure provision and the non-solicitation provision. (ECF No. 6-3 at 29-30.) Defendant Baker never responded to the letter. On June 22, 2018, another employee of

3

Plaintiff was going through Defendant Baker's old emails looking for an email address of one of Defendant Baker's former customers. (ECF No. 6-4 at 46-47; ECF No. 6-5 at 2-3.) The employee discovered that Defendant Baker had emailed confidential and trade-secret information from his work email account to his personal email account shortly before his separation from the company, including emails approximately five or six hours after Defendant Baker gave his two-weeks' notice of resignation on March 27, 2018. (ECF No. 6-5 at 2-3.) The attachments to Defendant Baker's emails contained highly confidential and sensitive information about Defendant Baker's customers, including his entire book of renewal business. (*Id.* at 4.) On July 27, 2018, Plaintiff's counsel sent cease and desist letters to Defendants Baker and IGO by email and by certified mail. (ECF No. 6-6 at 2-3; ECF No. 6-7 at 2-3.) No acceptable resolution was reached by the parties.

Plaintiff filed the underlying Complaint, pursuant to the court's diversity jurisdiction, on Thursday, August 23, 2018. (ECF No. 1.) The Complaint includes the following six causes of action: (1) violations of the federal Defend Trade Secrets Act of 2016; (2) violations of the South Carolina Trade Secrets Act; (3) breach of contract; (4) breach of contract accompanied by a fraudulent act; (5) tortious interference with contract; and (6) breach of the duty of loyalty. (ECF No. 1 at 5-12.) On August 27, 2018, Plaintiff filed the instant Motion for Temporary Restraining Order ("TRO") (ECF No. 6) against both Defendants, and the court set an emergency hearing for that same day at 3:00 p.m. (ECF No. 7). Plaintiff notified both Defendants of the Complaint, Motion, and the court's hearing. Plaintiff seeks the instant TRO under counts 1-4. (ECF No. 6 at 1-2.)

At the hearing, on August 27, 2018, Plaintiff's counsel was present and Defendant IGO's counsel was present, but Defendant Baker's counsel was not able to attend. During the hearing, Plaintiff stated that it was only concerned with obtaining a TRO and agreed to defer the

consideration of a preliminary injunction and civil seizure to a later date. Moreover, the parties agreed to engage in a discovery agreement, thereby relieving the court from deciding any expedited discovery issues. As such, the court is only addressing whether Plaintiff is eligible for a TRO.

## II. STANDARD OF REVIEW

Rule 65(b) of the Federal Rules of Civil Procedure authorizes a court to issue a TRO before it hears the merits of a suit. The decision of whether to grant or deny a TRO is in the sound discretion of the district court. *See Sinclair Refining Co. v. Midland Oil Co.*, 55 F.2d 42, 45 (4th Cir. 1932). Moreover, the purpose of a TRO is to "maintain the status quo while a lawsuit is pending." *Campbell All. Grp., Inc. v. Forrest*, No. 5:15-CV-667, 2015 WL 13718031, at *1 (E.D.N.C. Dec. 28, 2015) (citing *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014)). Substantively, the standard for evaluating the issuance of a TRO is the same as that of a preliminary injunction. *See U.S. Dep't of Labor v. Wolf Run Mining Co.*, 453 F.3d 275, 281 n.1 (4th Cir. 2006); *see also Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994) (applying the preliminary injunction standard to a request for a TRO).

In order for the court to grant a TRO, the movant must establish the following elements: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that a TRO is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four elements must be satisfied in order for a court to grant a TRO. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (citing *Winter*, 555 U.S. at 20). Pursuant to this analysis, a plaintiff must first make a "clear showing that [he] will likely succeed on the merits at trial." *Id.* Second, "the movant must make a clear showing that [he] will likely suffer irreparable harm without a TRO." *Cassidy v. Cliffs at High Carolina, LLC*, No. 6:12-cv-

02089-MGL, 2012 WL 13006006, at *2 (D.S.C. Aug. 2, 2012) (citations omitted). If the first two elements are shown, "only then may the court consider whether the balance of equities tips in the [plaintiff's] favor." *Lanier v. Branch Bank & Trust*, No. 3:12–416–MBS–SVH, 2012 WL 667034, at *1 (D.S.C. Feb. 28, 2012) (citing *Real Truth*, 575 F.3d at 346-47). Lastly, the court must pay particular regard to the public consequences of employing the extraordinary relief of a TRO. *Id.*

### III. DISCUSSION

#### A. Success on the Merits

##### 1. Trade Secret Claims

Under the South Carolina Trade Secrets Act ("SCTSA"), information is a trade secret only if it:

> derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[1]

S.C. Code Ann. § 39-8-20(5)(a) (West 2018). The plaintiff has the burden of establishing the existence of a trade secret. *See Lowndes Prods., Inc. v. Brower*, 191 S.E.2d 761, 765 (S.C. 1972). In order to establish the misappropriation of a trade secret, a plaintiff must prove five elements:

---

[1] Under federal law, the term "trade secret" is defined similarly to the SCTSA and is considered: "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if the owner thereof has taken reasonable measures to keep such information secret; and the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . ."
18 U.S.C. § 1839(3).

> (1) the existence of a trade secret; (2) communicated in confidence by the plaintiff to the employee; (3) disclosed by the employee in breach of that confidence; (4) acquired by the defendant with knowledge of the breach of confidence; and (5) used by the defendant to the detriment of the plaintiff.

*Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 725 (D.S.C. 2007).

Plaintiff's Declarations are sufficient to establish the aforementioned elements. First, Plaintiff's customer lists, contact information, policy expiration/renewal dates, premium amounts, and customers' insurance business needs are all protected as "trade secrets" because such information or data "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). This court has previously found such information to constitute a trade secret under the SCTSA. *See Vessel Med., Inc. v. Elliott*, No. 6:15–cv–00330–MGL, 2015 WL 5437173, at *7 (D.S.C. Sept. 15, 2015). Additionally, under the SCTSA, Plaintiff "has taken reasonable measures" to keep such information secret, including requiring employees to sign confidentiality provisions in the Agreement, promulgating privacy and confidentiality provisions in its employee handbook, password-protecting its computer systems and communications systems, and bringing prompt enforcement actions to protect its rights. (ECF No. 6-3 at 2-4.) As such, Plaintiff has established that the information at issue is a trade secret.

Plaintiff alleges that Defendant Baker emailed his book of business and other sensitive documents from his company email account to his private email account on March 27, 2018, some four or five hours after he provided his two-weeks' notice of his resignation. (ECF No. 6-5 at 3.) Further, Defendant Baker has refused to return all company property following at least three requests by Plaintiff and its attorney. (ECF No. 6-1 at 5-6.) As such, Defendant Baker had knowledge of the existence and substance of Plaintiff's trade secrets. (ECF No. 6-5 at 3.)

7

Moreover, Defendant Baker breached the confidence of Plaintiff by sending Plaintiff's trade secrets to his personal email and is possibly using that information to the detriment of Plaintiff. (ECF No. 6-5.) Accordingly, Plaintiff has demonstrated a likelihood of success on the merits on its trade secrets claims.

### 2. Breach of Contract Claims

Under South Carolina law,[2] "[r]estrictive covenants not to compete are generally disfavored and will be strictly construed against the employer." *Rental Unif. Serv., Inc. v. Dudley*, 301 S.E.2d 142, 143 (S.C. 1983). In order for a noncompetition agreement to be enforceable, a claimant must show the following about the agreement: (1) that it is necessary for the protection of the legitimate interests of the employer; (2) that it is reasonably limited in its operation with respect to time and place; (3) that it is not unduly harsh and oppressive in curtailing the legitimate efforts of the employee to earn a livelihood; (4) that it is reasonable from the standpoint of sound public policy; and (5) it is supported by valuable consideration. *Id.* at 143-44. A time restraint upon competition does not by itself make an agreement unreasonable, and three years will not invalidate a restrictive covenant not to compete. *Id.* Moreover, "[p]rohibitions against contacting existing customers can be a valid substitute for a geographic limitation" upon an employee. *Wolf v. Colonial Life & Accident Ins. Co.*, 420 S.E.2d 217, 222 (S.C. Ct. App. 1992).

In the instant case, there is not a question about whether the Agreement is supported by valuable consideration because Defendant Baker signed it upon the commencement of his

---

[2] Generally, the court applies South Carolina law when a contract dispute is brought pursuant to the court's diversity jurisdiction. See *Episcopal Church in S.C. v. Church Ins. Co. of Vt.*, 993 F. Supp. 2d 581, 586 (D.S.C. 2014) ("Because this action falls under the diversity jurisdiction granted to the federal courts by 28 U.S.C. § 1332, the [c]ourt looks to the law of South Carolina to determine the standards by which to evaluate the contract." (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938))).

employment with Plaintiff and was compensated yearly (ECF No. 1-1 at 4-5). *See Reidman Corp. v. Jarosh*, 345 S.E.2d 732, 733-34 (S.C. Ct. App. 1986) (holding that there was valuable consideration in an agreement to not compete). Next, the non-solicitation provision appears to be necessary for the protection of Plaintiff's legitimate business interests because it is specifically aimed at protecting Plaintiff's existing customers that Defendant Baker worked with during his employment with Plaintiff. This court has previously upheld such non-solicitation provisions as enforceable. *See Vessel Med., Inc. v. Elliott*, 2015 WL 5437173, at *6 (holding that a non-solicitation provision was not facially unenforceable under South Carolina law). With respect to the time limit, although South Carolina courts have never adopted a bright-line test for duration, a two-year non-solicitation provision is well within the time limits previously approved by the courts. *See Dudley*, 301 S.E.2d at 143. Third, the Agreement does not appear to be unduly harsh or oppressive and would not unreasonably interfere with Defendant Baker's ability to earn a livelihood because Defendant Baker has "ample opportunity to work within his industry." *Vessel Med., Inc.*, 2015 WL 5437173, at *6. Defendant Baker is free to seek gainful employment in his chosen field, but may not use confidential information of Plaintiff or solicit business from his former customers. *See Milliken & Co. v. Morin*, 731 S.E.2d 288, 295-96 (S.C. 2012) (holding that an agreement struck the "appropriate balance" between an employer's valuable interest in confidential information and allowing an employee to seek gainful employment). Lastly, the validity of Plaintiff's confidentiality and non-solicitation provisions with Defendant Baker are supported by public policy because they protect Plaintiff's legitimate interests in trade secrets and client relationships. *Vessel Med., Inc.*, 2015 WL 5437173, at *6. Accordingly, Plaintiff can establish a likelihood of success on the merits in its claim to enforce the non-solicitation and confidentiality provisions of the Agreement with Defendant Baker.

Plaintiff must also show the existence of a contract, breach of the contract, and damages as a result of the breach. *See Consignment Sales, LLC v. Tucker Oil Co.*, 705 S.E.2d 73, 76 (S.C. Ct. App. 2010) (citing *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962)). Based on the evidence presented, Plaintiff has shown a likelihood of success on the merits. Plaintiff and Defendant Baker entered into a binding contract, which was supported by sufficient consideration, when Defendant Baker began his employment with Plaintiff. (ECF No. 1-1 at 4-5.) Based upon evidence in the record, Defendant Baker violated the terms of the Agreement by contacting Plaintiff's clients and competing against Plaintiff. (ECF No. 1-1 at 2.) Moreover, Defendant Baker has breached Plaintiff's confidentiality policies under the Agreement and Communication System Policy Acknowledgement Form. (ECF No. 6-3 at 14, 20, 22.) In regard to damages and detailed below, Plaintiff has alleged that it suffered actual damages in commission revenue and that its insurance carriers have suffered losses in total premium revenue. (ECF No. 6-4 at 5.) Therefore, success on the merits of the breach of contract claim is likely.

**B. Irreparable Harm in the Absence of Preliminary Relief**

Generally, "the possibility of permanent loss of customers to a competitor or the loss of goodwill" may indicate the existence of irreparable harm. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (citing *Merrill Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)). Additionally, irreparable harm can be established by the loss of market share or price erosion, neither of which can be compensated through money damages alone. *See Z–Man Fishing Prods., Inc. v. Renosky*, 790 F. Supp. 2d 418, 4333 (D.S.C. 2011). "The loss of a trade secret is irreparable harm, and the threatened disclosure of a trade secret supports the imposition of injunctive relief." *Nucor Corp. v. Bell*, No. 2:06–CV–02972–DCN, 2008 WL 9894350, at *20 (D.S.C. Mar. 14, 2008) (*citing N.*

*Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999); *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 504-05 (5th Cir. 1982)).

Pursuant to the instant Motion, Plaintiff alleges that it has already suffered substantial losses in renewal premiums from Defendant Baker's old accounts because they have left Plaintiff since Defendant Baker's departure from the company on March 30, 2018. (ECF No. 6-1 at 12.) More specifically, Plaintiff argues that its insurance carriers have lost $295,834.00 in total premium revenues and that it has personally lost $45,241.27 in commission revenue. (ECF No. 6-4 at 5.) While Plaintiff cannot yet show whether some of its customers have moved their business to Defendants, Plaintiff has shown that it has lost approximately thirty-five percent of those policies which Defendant Baker previously managed for Plaintiff. (*Id.*) Further, Plaintiff maintains that after Defendant Baker was fired, many customers were preparing to leave its business and mentioned Defendants by name. (*Id.* at 4.) These facts are sufficient to show that Plaintiff's loss of customers, possibly at the hands of Defendant Baker, constitutes an irreparable injury. *See Multi-Channel TV Cable Co.*, 22 F.3d at 552.

**C. Balance of the Equities and the Public Interest**

The court finds that the balance of the equities factor sufficiently favors Plaintiff in this case. As noted above, Plaintiff is not seeking to prevent Defendant Baker from working at all in the insurance industry or even in the automotive aftermarket segment; they are trying to prohibit Defendant Baker from using Plaintiff's confidential and trade-secret information or soliciting his former customers in the course of such work. Any hardship to Defendant Baker from the issuance of a TRO or preliminary injunction should be modest in comparison to the hardship Plaintiff is likely to suffer if its Motion is denied. *See Vessel Med., Inc.*, 2015 WL 5437173, at *10. The court also finds that the public interest factor supports the issuance of a TRO in this case. The relief

requested by Plaintiff is consistent with the public interests of enforcing valid contracts, preventing unfair competition, and protecting confidential, trade-secret information from improper misappropriation. *Id.* There is not an adverse impact upon the public interest that may be caused by the issuance of the requested injunctive relief.

For all of the foregoing reasons, the court hereby enters the following TRO: (1) Defendant Baker is hereby enjoined from contacting or soliciting any former customer (or employee, agent, or representative of a former customer) of Plaintiff, directly or indirectly, in any manner or in any form, including by telephone, email, text message, instant message, written or electronic correspondence, or in person; (2) Defendant Baker is ordered to return the mobile phone, belonging to Plaintiff, pursuant to the signed Mobile Phone Policy; (3) Defendants Baker and IGO are hereby enjoined from disclosing, using, propagating, or disseminating any of Plaintiff's confidential and trade secret information, including customer names, contact information, and policy information such as expiration or renewal dates, coverages, and premiums; and (4) Defendants Baker and IGO are hereby ordered to preserve and maintain any and all documents, evidence, or other items, including electronically stored information, that is relevant to any claim or defense in this action or that may be reasonably calculated to lead to the discovery of admissible evidence.

## IV. CONCLUSION

After a thorough review of Plaintiff's Motion (ECF No. 6), and the accompanying declarations and exhibits attached thereto, the court **GRANTS** Plaintiff's Motion for Temporary Restraining Order. (ECF No. 6.) Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, this TRO will expire on <u>September 11, 2018 at 9:00 p.m.</u> A hearing on Plaintiff's Motions for Civil Seizure of Devices, Preliminary Injunction, and Expedited Discovery (ECF No. 6) will be

scheduled for Monday, September 10, 2018, at 12:30 p.m., and notice will be made pursuant to the Court's ECF system. Defendants have until Tuesday, September 4, 2018, to respond to Plaintiff's Motions, and Plaintiff has until Saturday, September 8, 2018, to reply to Defendants' response. If no attorneys have filed notices of appearance for Defendants prior to the date of such notice, Plaintiff's counsel must notify Defendants of the hearing through appropriate means and must file corresponding certificates of service.

The court **HOLDS IN ABEYANCE** Plaintiff's Motions for Civil Seizure of Devices, Preliminary Injunction, and Expedited Discovery. (ECF No. 6.)

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

August 29, 2018
Columbia, South Carolina